# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LISA HENDERSON,                    :
                                   :
  Plaintiff,                   :
                                   :
v.                                 :       No. 3:03cv2176(DJS)
                                   :
GENERAL ELECTRIC CO.,              :
ET AL.,                            :
                                   :
  Defendant.                  :

## MEMORANDUM OF DECISION

On December 17, 2003, plaintiff Lisa Henderson ("Henderson") filed this action alleging that her employer, General Electric Company ("GE"), discriminated against her because of her gender and race in violation of Title VII of the Civil Rights Act of 1964 and 1991.  42 U.S.C. §§ 2000e et seq. and 42 U.S.C. § 1981.  Plaintiff filed an Amended Complaint on April 26, 2004 and a Second Amended Complaint on June 23, 2004.[1]   On July 29, 2005, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendants filed a motion for summary judgment. (Dkt. # 44)  For the reasons set forth herein, defendants' motion is **GRANTED**.[2]

## I.  FACTS

In 1987, the General Electric Company ("GE") hired Lisa Henderson ("Henderson") as a Customer Service Representative.  From 1987 through 2002, Henderson worked in a variety of

---

[1] In her Second Amended Complaint, plaintiff names four defendants: General Electric Company, GE Industrial Systems, GE Digital Energy, and GE IMV.

[2] Plaintiff, in her opposition to defendants' motion for summary judgment, elected to "drop her claim of race discrimination."  (Dkt. # 49.)  Accordingly, Count One and Count Three of Plaintiff's Second Amended Complaint are hereby **DISMISSED**.

managerial and supervisory jobs for GE, during which time she performed at a high level. Henderson consistently placed at the top of the employee ranking scale and received performance awards for her work.  In November 2001, Henderson was considered for a promotion to the position of "Director of Quality and Information Technology at GE IMV" in Riazzino, Switzerland.[3]

The parties dispute whether James Shepard ("Shepard"), the President and CEO of GE Digital Energy, or Antoinette Gawin ("Gawin"), the CEO of GE IMV, hired Henderson as the Director of Quality and Information Technology.  Henderson was interviewed by Gawin; Paola Madrisotti ("Madrisotti"), the Human Resources Manager for GE IMV; and John Burns ("Burns"), the Quality Leader in Europe.  During the interview process, Gawin's boss was replaced by Shepard.  Thus, Henderson also met with Shepard, although the parties dispute whether this meeting was just a "formality."  Henderson received a letter signed by Gawin and Madrisotti, which offered her the position of Director of Quality and Information Technology of GE Systems.

Henderson assumed her new post on January 20, 2002.  In her new role, she was responsible for both Six Sigma and IT projects.  Six Sigma is a methodology used by GE to improve business performance through statistical analysis, and IT refers to Information Technology.  Initially, plaintiff worked on both Six Sigma and IT projects.  Then, in February or March of 2002, Gawin and the head of Information Technology, Mark Lovelace, told Henderson

---

[3]  At the time of the events alleged, GE IMV reported to GE Digital Energy, which was located in Georgia.  GE Digital Energy was a sub-business of GE Industrial Systems, which was based in Connecticut.  Due to a series of reorganizations, the entities formerly known as GE Industrial Systems and GE Digital Energy no longer exist.

2

to devote 100% of her resources to a large IT project known as SAP.  Plaintiff served as the Joint

Project Manager of the SAP project from approximately March 2002 until late August or early

September 2002.  As a result of Henderson's performance, she was given the highest award

possible at GE.

In the interim, in February or March 2002, Burns left his position.  Shepard hired Burns's

replacement, Brigitte LaCroix ("LaCroix"), during the month of July, 2002.   LaCroix was given

the responsibility of supervising Six Sigma projects for all the GE Digital Energy businesses,

including GE IMV.  Upon starting her new assignment, LaCroix discovered that very little

progress had been made with regard to Six Sigma implementation.   LaCroix testified that she

was under pressure from Shepard to increase the number of Six Sigma projects and that she

discussed Henderson's performance with Blanca Blaney ("Blaney"), the Human Resources

Manager for GE Digital Energy.  Blaney also provided deposition testimony that in July or

August of 2002, LaCroix approached her regarding Henderson's performance.  (Dkt. # 44-10,

Blaney Dep., Ex. 13 at 44:2-16.)  Henderson alleges that during this time period she was

completely devoted to SAP, and that Blaney and LaCroix never conveyed Shepard's displeasure

regarding the lack of Six Sigma projects to her.

After LaCroix assumed the position of Quality Leader, she told Blaney and Lovelace that

she wanted Henderson to be fully dedicated to Six Sigma.  In August 2002, LaCroix approached

Henderson to discuss whether Henderson would work exclusively on Six Sigma.  The parties

dispute whether LaCroix gave Henderson the option of choosing between IT and Six Sigma.

Henderson asserts that LaCroix informed her that she would only be working on Six Sigma,

while LaCroix and Blaney provided deposition testimony that Henderson was given a choice and

3

that she selected Six Sigma.  In September 2002, Henderson resumed her work on Six Sigma and all of her IT responsibilities were assigned to Jean-Michele Zwygart.

The parties dispute the quality of Henderson's work once she resumed work on Six Sigma.  An August 16, 2002 email from LaCroix to Henderson contained a list of items for Henderson to work on.  These items included several completion deadlines.  Defendants assert that Henderson missed all of these deadlines while Henderson maintains that she only missed some of the deadlines because of circumstances beyond her control.

On October 1, 2002, Henderson missed a planned meeting with LaCroix, Blaney, and Madrisotti.  Henderson sent an e-mail to LaCroix, Blaney, and Madrisotti apologizing for missing the meeting and explaining that she was "stuck in another meeting and lost track of time."  (Dkt. # 44, Ex. 2.)  LaCroix forwarded this email to Shepard and Blaney and indicated that she was concerned about Henderson's "ability to follow through and take her . . .  role seriously."  Id.  In the same email, LaCroix also stated that she would give Henderson "through the end of the year where we can then make an evaluation," and that she would "provide the coaching and give her [Henderson] all the tools and support she needs to be successful."  Id.  Henderson was unaware of the email at the time it was sent.

On October 29, 2002, LaCroix reviewed a document entitled "Project Plan for Lisa Henderson" with Henderson over a conference call.  (Dkt. # 44, Ex. 3.)  Prior to the teleconference, LaCroix forwarded the plan to Blaney and Mauro Canova ("Canova"), the General Manager for GE IMV.  Then, on November 7, 2002, LaCroix again discussed this project plan with Henderson over a conference call.  LaCroix noted that Henderson missed several deadlines, which Henderson contends were not deadlines at all, but merely target dates.

4

During the teleconference, Henderson questioned whether the project plan was a formal "Performance Improvement Plan."[4]  When LaCroix responded that the project plan was a Performance Improvement Plan, Henderson became upset.  The parties dispute whether Henderson hung-up on LaCroix or whether the call mutually ended.  Following this conversation, LaCroix emailed Blaney to express her concerns about Henderson.  (Dkt # 44, Ex. 4.)  In this email, LaCroix again noted that she hoped to have a review of Henderson's performance in mid-January.  Thereafter, Henderson, LaCroix, Canova, and Blaney had a teleconference where Blaney explained that Henderson was not on a formal "Performance Improvement Plan" because the proper procedures had not been followed.

On November 12, 2002, Henderson made three separate presentations to Shepard on Billing Accuracy and Post Sales Service Issue Resolution.  Henderson was praised for her performance.  Then, on December 3, 2002, Henderson along with the two Quality Leaders from the other two GE Digital Energy businesses made presentations to Shepard.  The presentations were considered a "dry run" for a report that Shepard and LaCroix would present to Shepard's boss, Lloyd Trotter, President of Industrial Systems.  Henderson admits that there were technical problems with her presentation and that she was unable to answer a question posed to her by Shepard.[5]  Her PowerPoint slides were missing information and contained incorrect graphs and incomplete templates.  Additionally, some of her pie charts were missing numbers, while others had numbers off the page.  LaCroix considered the presentation to have gone "very poorly."

_____

[4] At GE, a "Performance Improvement Plan" is a formal plan that sets specific deadlines for an employee to improve her performance before facing termination or other disciplinary action.

[5] Henderson also notes that Mohammed Alwan, one of the other presenters at the meeting of December 3, 2002, was not able to answer a Six Sigma question that Shepard asked him.

(Dkt. # 44, LaCroix Dep., Ex. 9 at 165:23.)  Shepard spoke with Henderson after the presentation

to express his disappointment and to question whether Henderson should continue in her current

role.  Shepard also spoke with Blaney, who was not present for the presentation, and told her that

Henderson's performance was "totally unacceptable."  (Dkt. # 44, Blaney Dep., Ex. 10 at 122:5.)

Shepard indicated that he never wanted to have a meeting like that again with one of his leaders.

Later that day, LaCroix expressed her disappointment with Henderson's presentation by

calling and emailing Henderson.  Henderson responded to LaCroix's email, indicating that she

had fallen short on delivering what she had been responsible for and that she was not proud of

her performance.  Then, on Thursday, December 5, 2002, a conference call was set up between

Henderson, LaCroix, and Canova to discuss Henderson's performance at the December 3, 2002

meeting.  Henderson and Canova were in Canova's office in Switzerland, while LaCroix was at

GE Digital Energy in Georgia.  During the conversation, LaCroix discussed Henderson's

presentation and informed her that she was being placed on a formal "Performance Improvement

Plan."  Thereafter, Henderson became very upset.  She provided the following deposition

testimony regarding this meeting:

> the statement was said from Brigitte [LaCroix] that I was going to be put on the
> performance plan, and I told both Brigitte [LaCroix] and Mauro [Canova] that I
> no longer - - if I had to be put on a performance plan, that I no longer wanted to
> work in the business, and Brigitte [LaCroix] asked me if I was - - was my
> resignation; was I resigning.  I said I no longer wanted to be in the business.  Then
> she asked again, does that mean you want to resign, and I said yes.
>
> She immediately left the phone and went to get Blanca [Blaney] and bring
> Blanca [Blaney] onto the phone.  Blanca [Blaney] came on the call, and her first
> question she asked me was what date did I want to leave - - did I want to depart.
>
> The situation was emotional then.  I was in the room with Mauro
> [Canova].  I was crying in the room with Mauro [Canova], and Mauro [Canova]

6

> just asked that we all just stop and take a break and that we regroup on
> Monday . . . .

(Dkt. # 49-4, Henderson Dep., Ex. 2 at 7:14 -8:7.)  LaCroix testified that the only reason the

meeting was continued until Monday was to work out the details surrounding Henderson's

resignation.  Henderson counters that she did not resign and that the purpose of the Monday

meeting was to continue to discuss her performance and her future at GE after she had composed

herself.  She avers, "When I made this statement [that I no longer wanted to work in the

business], I was referring to the fact that I no longer wanted to work with Ms. LaCroix and Mr.

Shepard.  I had no intention of giving up my 15 year career with General Electric."  (Dkt. # 49-3,

Henderson Aff., Ex. 1 ¶ 15.)  In addition, Henderson testified, "After the meeting was over, when

everyone was off the phone  Mauro [Canova] and I continued to talk.  Mauro [Canova] could

physically see that I was upset.  Mauro [Canova] told me to take the time to think about it.  And

that's what I did.  And I left his office and I went back to work."  (Dkt. # 49-4, Henderson Dep.,

Ex. 2 at 22:4-10) .

    At some point following the conference call of December 5, 2002, Blaney informed

Shepard that Henderson had resigned and that her resignation had been accepted.  Henderson,

however, returned to work on Friday, December 6, 2002.  When Henderson returned to the

office, no one informed her that she was no longer considered an employee.  In addition,

Henderson reported for work on Monday, December 9, 2002.  She testified, "On the Monday

[December 9, 2002], I spoke with Mauro [Canova] first, and we talked and I told him that I

thought about it, and I had decided not to resign and that I was going to stay with the business."

(Dkt. # 49-4, Henderson Dep., Ex. 2 at 23:5-8.)  Thereafter, Canova, Henderson, Blaney, and

LaCroix participated in a conference call.  Henderson stated that she wanted to rescind her

resignation, but LaCroix and Blaney refused, explaining that they had already accepted her

resignation.  According to LaCroix, she did not allow Henderson to rescind her resignation both

"because of her performance" and because she had "lost confidence in her [Henderson's] ability

to perform in that position." (Dkt. # 44, LaCroix Dep., Ex. 9 at 197:16-17.)  Blaney agreed.  She

testified that "it is not in the best interest of the corporation to maintain leaders who cannot make

decisions," and that GE "can't afford to have those leaders making decisions who are going to

change their minds."  (Dkt. # 44, Blaney Dep., Ex. 10 at 146-47:22-3.)  According to both Blaney

and LaCroix, Henderson would not have been terminated if she had not resigned.  The parties do

not dispute that Shepard approved Blaney and LaCroix's decision not to allow Henderson to

rescind her resignation.  (Dkt. # 49-2, ¶ 40.)

 After the December 9, 2002 conference call, Henderson refused to submit an official

letter of resignation.  She returned to work on December 10, 2002, and December 11, 2002.  On

Wednesday, December 11, 2002, Canova told Henderson to leave the building and to wait for

further instruction from the company.  Thereafter, Shepard, Canova, and LaCroix sent a

termination letter to Henderson dated December 16, 2002.  The letter reads,

> This is to confirm our meeting on Thursday, December 5, 2002 in which you
> announced to us your resignation from GE Digital Energy SA and our subsequent
> discussions.  At that meeting, you voluntarily resigned, as we understood you did
> not want to continue in your role.  We agreed to accept your resignation and begin
> your transition.  Given your emotional state we all agreed to give you time to
> collect yourself and we would follow up on the transition plan on Monday
> December 9, 2002.
>
>  We were surprised, therefore, when you came back into the office and
> stated that you wanted to retract your resignation.  Given the performance issues
> we have discussed and the feedback you received concerning your presentation to

the CEO last week, we do not feel able to continue the employment relationship and have to insist on the validity of your resignation.  Given what has happened, we sent you home pending confirmation of your status.

Accordingly and for the avoidance of any doubt as to the status of your employment with GE Digital Energy SA this letter serves as notice that we are terminating your employment should your resignation against our expectations not be valid.

(Dkt. # 44-7, Ex. 9.)  Henderson was paid until March 2003.

The parties dispute whether Henderson was permitted to return to GE IMV during her severance period and whether she was allowed to return company property and to pick up her personal property.  The parties also dispute who performed Henderson's duties following her departure.  Defendants maintain that the Six Sigma program was restructured and that Janice Burr, a female employee working in the United States, assumed Henderson's responsibilities.  Henderson argues that her employer offered her position to Otavio Kehdi ("Kehdi") and that although he declined the offer, he performed some of her duties, such as staff meetings and updates.

According to Henderson, her termination was a product of gender discrimination.  In support of this assertion, Henderson argues: (1) during her tenure at GE IMV, Shepard terminated four female executives and replaced them with men; (2) these females told her that they were removed because they were women; (3) she witnessed Shepard make sexist comments about Blaney; and (4) the male employees who gave poor presentations or resigned were treated more favorably than she was.  Specifically, Henderson alleges that GE IMV was referred to as "the company run by women" and that Shepard replaced Cigdem Kasdan ("Kasdan"), Gawin, Madrisotti, and Henderson with male employees.  The parties agree that Kasdan, the Chief

9

Financial Officer, and Gawin, the CEO of GE IMV in Switzerland, were both removed for

performance reasons.  Kasdan was replaced by Neville Jones, and Gawin was replaced by Mauro

Canova.  Both Jones and Canova are males.  Madrisotti, the former Human Resources Manager

of GE IMV, resigned and was replaced by Fausto Polumbo, also a male employee.  The parties

dispute whether Madrisotti resigned to start her own business or because she felt that she was

being discriminated against.  The parties also dispute whether Henderson was replaced with a

male or a female employee.

In further support of her claim that Shepard removed Gawin, Kasden, and Madrisotti

because they were women, Henderson testified that Gawin, Kasdan, and Madrisotti told her that

they believed they were removed because they were women.  Indeed, Henderson alleges that

when Madrisotti was leaving the company she stopped by Henderson's office and warned her

that "they were getting rid of the women in the company and [she] was next."  (Dkt. # 49-4,

Henderson Dep., Ex. 2 at 39:7-9.)  Henderson also claims that following her termination, she

spoke with Neville Jones ("Jones"), the new Chief Financial Officer, and that Jones also felt that

Henderson, Gawin, and Kasdan, were terminated because they were women.  Henderson,

however, did not submit sworn affidavits or deposition testimony of Gawin, Kasdan, Madrisotti,

or Jones.

As further evidence that Shepard discriminated against women, Henderson alleges that

other employees warned her about Shepard's attitude towards women.  According to Henderson,

her prior boss, Gary Randolph, told her "to be very careful, because Jim [Shepard] didn't play

fair and that he had a problem with women."  (Dkt. # 49-4, Henderson Dep., Ex. 2 at 162:12-14.)

She also asserts that Blaney testified (1) that Gawin told her that she was uncomfortable around

Shepard because he had been demeaning towards her and (2) that Madrisotti told Blaney that Shepard put more pressure on Gawin than on her male colleagues.  In her deposition, however, Blaney testified that she did not recall whether anyone specifically told her that Shepard was biased against women. (Dkt. # 44, Blaney Dep., Ex. 10 at 112-13:25-1.)  Blaney also characterized the conflict between Gawin and Shepard as one of clashing personalities, not one of gender bias.  (Dkt. # 44, Blaney Dep., Ex. 10 at 111:11.)

Henderson also testified that Shepard made demeaning remarks toward Blaney. Henderson claims that at a staff meeting, she witnessed Shepard made a derogatory remark about Blaney leaving to "fix her lipstick" when Blaney excused herself from the meeting.  (Dkt. # 44, Henderson Dep., Ex. 8 at 56:6-7.)   She also states that on another occasion, Shepard commented about Blaney wearing a skirt and high heels on the factory floor.  (Dkt. # 44, Henderson Dep., Ex. 8 at 40:14-18.)

Lastly, Henderson claims that she was treated differently than her male co-workers.  She claims: (1) that she was excluded from the annual sales meeting because she was a woman; (2) Tiziano Christian and Mohammed Alwan, two male employees, were not terminated even though they made poor presentations to Shepard; (3) male employees were allowed to rescind their resignations; and (4) Henderson was locked out of the building following her termination and was denied the opportunity to access the GE network or find alternative work within GE.

## II. DISCUSSION

### A.  Defendants' Motion To Strike

Defendants urge the court not to consider Henderson's deposition testimony that Gawin, Kasdan, and Madrisotti told her that they believed the reason they were leaving GE IMV was

because they were women. Defendants maintain that these statements are inadmissible and that the court cannot consider them when deciding the pending motion for summary judgment because they are unsupported, speculative, and hearsay. (Dkt. #s 44, 56.) The court shall construe defendants' request as a motion to strike.

### 1. Standard Of Review

"[A] motion to strike is appropriate if documents submitted in support of a motion for summary judgment contain inadmissable hearsay or conclusory statements, are incomplete, or have not been properly authenticated." Merry Charters, LLC v. Town of Stonington, 342 F. Supp. 2d 69, 75 (D. Conn. 2004) (citing Spector v. Experian Info. Serv. Inc., 321 F. Supp. 2d 348, 352 (D. Conn. 2004)). "In ruling on a motion to strike, the court applies the Federal Rules of Evidence to determine whether evidence would be admissible at trial and thus whether a court can consider them in a ruling on a motion for summary judgment." Glynn v. Bankers Life and Cas. Co., No. 3:02CV1802 (AVC), 2005 WL 2028698, at *1 (D. Conn. Aug. 23, 2005) (citing Raskin v. Wayatt Co., 125 F. 3d 55, 66 (2d Cir. 1997)). Rule 56(e) of the Federal Rules of Civil Procedure requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

### 2. Analysis

Defendants contend that Henderson's deposition testimony that Gawin, Kasdan, and Madrisotti told her that they were leaving GE IMV because they were women constitutes hearsay, which the court cannot consider when deciding a motion for summary judgment.

12

"Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). While testifying at her deposition, Henderson repeated comments that Gawin, Kasdan, and Madrisotti told her during private conversations that were not part of a court proceeding. With respect to Gawin, Henderson testified that Gawin told her "[t]hat she [Gawin] believed that Jim [Shepard] had a problem with women and that her [Gawin's] departure was because she was a woman and she was concerned with my [Henderson's] well-being." (Dkt. # 49-4, Henderson Dep., Ex. 2 at 53:17-20.) Henderson also testified that Kasdan said that her removal "was based on the fact that she [Kasdan] was a woman." (Dkt. # 49-4, Henderson Dep., Ex. 2 at 58:6-7.) As for Madrisotti, Henderson testified, "[t]hat Paola [Madrisotti] had stopped by my office to warn me to beware, because they were getting rid of the women in the company and that I was next." (Dkt. # 49-4, Henderson Dep., Ex. 2 at 39:7-9.) In each instance, Henderson is offering out of court assertions, made by her co-workers, for the truth of the matter asserted. As such, defendants argue that these statements are inadmissible hearsay. Henderson, however, argues that these assertions qualify as non-hearsay statements pursuant to Federal Rule of Evidence 801(d)(2)(D).

A statement is not hearsay if it is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). To support the introduction of statements offered against an employer, the plaintiff must establish, (1) the existence of the agency relationship, (2) that the statement was made during the course of the agency relationship, and (3) that it relates to a matter within the scope of the agency. Pappas v. Middle Earth Condominium Assoc., 963 F.3d 534, 537, (2d. Cir. 1992).

It is undisputed that both Gawin and Kasdan were agents of GE because Gawin was the CEO of GE IMV and Kasdan was the Chief Financial Officer of GE IMV.  Although it is unclear precisely when Gawin and Kasdan made these statements, neither statement qualifies as an admission by a party opponent under Federal Rule of Evidence 801(d)(2)(D) because neither statement relates to a matter within the scope of the agency relationship.   Gawin's comment that she believed that Shepard had a problem with women and Kasdan's remark that her removal was based on the fact that she was a woman do not qualify as statements that Gawin or Kasdan made in their official capacity as GE executives.  Rather, they are Gawin's and Kasdan's opinions about the circumstances surrounding their own impending termination, which do not fall within the scope of their agency powers.   Accordingly, these statements, which do not satisfy Federal Rule of Evidence 801(d)(2)(D), shall be stricken as inadmissible hearsay.

Defendants also seek to strike Henderson's testimony that Madrisotti stopped by her office following the departure of the Gawin and Kasdan to warn Henderson "to beware because they were getting rid of the woman in the company and [Henderson] would be next."  (Dkt. # 49-4, Henderson Dep., Ex. 2 at 39:7-9.)   According to Henderson, these statements were made "on the day that she [Madrisotti] was leaving the facility."  (Dkt. # 44, Henderson Dep., Ex. 8 at 38:22-23.)  It is unclear from the record whether Madrisotti was still an agent of GE when she made these statements to Henderson.  Madrisotti's personal reasons for voluntarily leaving the company, however, are distinct from her authority to speak as an executive.  Additionally, the warnings she gave to Henderson do not fall within the scope of her agency powers because she did not provide them within her official capacity as a GE executive.  Therefore, Madrisotti's statements do not satisfy Federal Rule of Evidence 801(d)(2)(D).  Accordingly, Henderson's

14

deposition testimony as to what Madrisotti told her is stricken as hearsay.

Defendants' motion to strike, as inadmissible hearsay, Henderson's deposition testimony that Gawin, Kasdan and Madrisotti told her that, in their opinion, the reason they were leaving GE IMV was because they were women is **GRANTED**.[6]

### B. Defendants' Motion For Summary Judgment

Henderson accuses defendants of discriminating against her on the basis of her gender in violation of Title VII.  Defendants claim Henderson has not brought forth sufficient evidence to sustain her claim and seek summary judgment.

### 1. Summary Judgment Standard

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burdens of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir.

---

[6] The court observes that plaintiff did not depose Gawin, Kasdan, or Madrisotti.  Nor did plaintiff offer affidavits completed by Gawin, Kasdan, or Madrisotti.  To the extent that the statements made by Gawin, Kasdan, and Madrisotti are offered to show that Henderson was a victim of gender discrimination, they are stricken as inadmissible as lay opinion statements.  See Hester v. Bic Corp., 225 F.3d 178, 185 (2d Cir. 2000) (holding "that in an employment discrimination action, Rule 701(b) [of the Federal Rules of Evidence] bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision.").  Further, a review of the record reveals that these statements are unsupported by the evidence and speculative.

1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520,

523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The

court must view all inferences and ambiguities in a light most favorable to the nonmoving party.

See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could

not differ as to the import of the evidence is summary judgment proper."  Id.

### 2. Discrimination Claim

Henderson claims that she was terminated because of her gender.  Title VII of the Civil

Rights Act of 1964 makes it unlawful for an employer to discriminate against its employees

because of an employee's sex.  42 U.S.C. § 2000e-2(a)(1)**.**  One method of proving gender

discrimination is for the plaintiff to introduce circumstantial evidence by way of the burden-

shifting framework established in McDonnell Douglass Corporation v. Green, 411 U.S. 792

(1973), and its progeny.  Specifically, plaintiff must initially prove a prima facie case of gender

discrimination by demonstrating that she suffered an adverse employment action under

circumstances supporting a reasonable inference of gender discrimination.  See Patterson v.

County of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004).  To establish a prima facie case of

gender discrimination, the plaintiff must prove that (1) she was a member of a protected class; (2)

she was qualified for the position she held; (3) she suffered an adverse employment action; and

(4) the adverse employment action occurred under circumstances giving rise to an inference of

discrimination.  See Patterson, 375 F.3d at 221; Norville v. Staten Island University Hospital,

196 F.3d 89, 95 (2d Cir. 1999); Schnabel v. Abramson, 232 F.3d 87, 87 (2d Cir. 2000).

16

Plaintiff's burden in this regard has been described as "minimal." Zimmerman v. Associates First Capitol Corp., 251 F.3d 376, 381 (2d Cir. 2001). "The mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of Title VII analysis." Id.

If the plaintiff is able to establish the elements of her prima facie case, a presumption arises that the employer unlawfully discriminated against her, and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. See id.; Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997). The reason provided must be both "clear and specific." Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985). The defendant's burden at this stage is one of production only; the defendant is not required to prove that its stated reason actually motivated its actions. The burden of persuasion rests, at all times, with plaintiff to prove that she was discriminated against because of her gender. Zimmerman, 251 F.3d at 381; Farias v. Instructional Systems, Inc., 259 F.3d. 91, 98 (2d Cir. 2001).

Once the employer has articulated a legitimate non-discriminatory reason for the adverse employment action, the presumption dissipates and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Patterson, 375 F.3d at 221. In order to avoid summary judgment at this stage, the plaintiff must show that there is sufficient evidence to permit a rational jury to infer that the employer's stated reason is a pretext for discrimination. Conclusory and substantially unsupported assertions of pretext are inadequate in this regard. See id. (citing Smith v. American Express Co., 853 F.2d 151, 154-55 (2d Cir.

1988)).  To meet this burden, the plaintiff may rely on "evidence constituting the prima facie case, together with supportable inference to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action."  Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 135 (2d Cir. 2000); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000).  The plaintiff is not required to prove that the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision, but only that the plaintiff's membership in a protected class contributed to the employer's decision.  See Holtz v. Rockerfeller & Co., 258 F.3d 62, 78-79 (2d Cir. 2001); Renz v. Grey Advertising, Inc., 135 F.3d 217, 220-22 (2d Cir. 1997); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995).

Whether a plaintiff met her ultimate burden of proving discrimination should be determined on a case-specific approach upon consideration of a number of factors, including the strength of the prima facie case, the probative value of any proof that the employer's stated reason for the adverse employment action is false, and any other evidence that supports the employee's case and that properly may be considered in a motion for summary judgment as a matter of law.  See Zimmerman, 251 F.3d at 381 (citing Reeves, 530 U.S. at 148-49).  Proof that the employer's proffered reason for the adverse employment action is unworthy of belief constitutes "circumstantial evidence that is probative of intentional discrimination."  Reeves, 530 U.S. at 147.  Evidence that the employer's reason is false, combined with the prima facie case, could be sufficient to allow the issue to go to the jury.  See Reeves, 530 U.S. at 148.  Summary judgment may be granted if the record reveals conclusively that there was "some other non-discriminatory reason for the employer's decision [or] the plaintiff created only a weak issue of

18

fact as to whether the employer's reason was untrue, and there was abundant and uncontradicted evidence that no discrimination had occurred." Reeves, 530 U.S. at 148.

Here, both parties have met their respective initial burdens with respect to the first two steps of the burden shifting analysis.  Henderson has established a prima facie case of gender discrimination.  She was female, she was qualified for the position she held, and she did suffer an adverse employment action when she was terminated.  With regard to circumstances giving rise to an inference of discriminatory intent, Henderson offers evidence that a male employee, Otavio Kehdi ("Kehdi"), was offered her job.  Henderson further maintains that Kehdi assumed her duties.  The defendants dispute Henderson's assertion.  They claim that no one was hired to replace Henderson because Six Sigma was reorganized and Janice Burr, a female employee already working for GE in the United States, was assigned Henderson's duties in addition to her prior responsibilities.  While the parties dispute whether a male or female employee assumed Henderson's duties, at the summary judgment stage, such ambiguities must be viewed in a light most favorable to the nonmoving party.  See Bryant, 923 F.2d at 982.  Therefore, Henderson's offer of proof that Kehdi assumed her duties is sufficient to give rise to an inference of discriminatory intent at this stage in the analysis.  See Zimmerman, 251 F.3d at 381-82 (finding that the evidence necessary to establish a prima facie case is "minimal" and "de minimis" and that the mere fact the plaintiff was replaced by someone outside the protected class will suffice for the inference of discrimination at this stage.)

In response to Henderson's prima facie claim, defendants have articulated a non-discriminatory reason for Henderson's departure from the company.  The defendants have offered evidence showing that Henderson had a documented period of inadequate performance,

culminating in her poor presentation on December 3, 2002.  According to the defendants,

following this poor performance, Henderson resigned on December 5, 2002.  It was only after

Henderson later refused to submit a letter of resignation that GE sent her a letter of termination.

Defendants assert that Henderson was not allowed to retract her resignation because of her failure

to meet expectations and because her superiors had lost confidence in her ability to perform the

required duties of her position.  This offer of proof is sufficient to meet the defendants' burden at

this stage in the analysis.  See Reeves, 530 U.S. at 142.

    The burden, therefore, shifts back to Henderson to prove by a preponderance of the

evidence that defendants' proffered reasons are not true and that the true reason for Henderson's

termination was impermissible gender discrimination.  See Carlton, 202 F.3d at 135.; see also

Reeves, 530 U.S. at 142.  Henderson has not met this burden.  Henderson has not offered any

evidence to indicate that GE's proffered reasons for her termination are not true or that they were

pretext for discrimination.  Although Henderson claims that her work was excellent and offers a

list of accomplishments that she effectuated while working in her Six Sigma role, she does not

dispute that LaCroix attempted to monitor her work closely by giving her lists with specific tasks

and deadlines and that LaCroix and Blaney testified that they had conversations about the quality

of her work.[7]  Further, Henderson admits that on October 29, 2002, and November 7, 2002, she

and LaCroix participated in teleconferences during which LaCroix noted that Henderson had

_____

    [7]  Henderson asserts that LaCroix's attempts to place her on a formal "Performance
Improvement Plan" are evidence of gender discrimination.  Henderson, however, does not offer
any evidence relating to whether LaCroix attempted to place male employees on similar plans.
Indeed, other than Henderson's own conclusory statements, she offers no evidence to support the
proposition that LaCroix attempted to place her on a formal Performance Improvement Plan
because she was a woman.

missed deadlines.  Plaintiff also admits that she did not attend a pre-scheduled meeting with her supervisors on October 1, 2002, and that on the same day, LaCroix emailed Shepard and Blaney about her concerns regarding Henderson's performance.  Furthermore, Henderson concedes that LaCroix again emailed her concerns about Henderson to Blaney on November 7, 2002.  She also admits that she gave a sub-par presentation to the CEO of GE Digital Energy on December 3, 2002, and that she subsequently informed her supervisors, on December 5, 2002, that she no longer wanted to work in the business.  Lastly, although Henderson argues that LaCroix and Blaney were not the primary decision-makers with respect to her termination, Henderson admits that Shepard did not participate in the teleconferences of December 5, 2002 and December 9, 2002.  Henderson also does not dispute that Blaney and LaCroix lost confidence in her ability after she said that she wanted to leave the business and that Shepard only approved of LaCroix and Blaney's decision not to allow her to rescind her resignation.  Accordingly, Henderson has not shown that there is a factual dispute surrounding the veracity of defendants' proffered explanations for her termination.

Henderson has also not shown that her status in a protected class contributed to her employer's decision to terminate her.  Although she asserts that the demeaning remarks Shepard made regarding Blaney furthers her claim that she terminated because of her gender, these comments are "stray remarks" that cannot be used to prove discrimination.  Stray remarks, absent some nexus between the alleged comments and the adverse action, cannot prove a claim of employment discrimination.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001).  To determine whether a comment is a probative statement evidencing an intent to discriminate or a nonprobative "stray remark," courts consider the following factors:

21

> '(1) who made the remark, i.e., a decision-maker, a supervisor, or a
> low-level coworker; (2) when the remark was made in relation to
> the employment decision at issue; (3) the content of the remark,
> i.e., whether a reasonable juror could view the remark as
> discriminatory; and (4) the context in which the remark was made,
> i.e., whether it was related to the decision-making process.'

Young v. Pitney Bowes, Inc., No. 3:03CV1161 (PCD), 2006 U.S. Dist. LEXIS 20788, at *59-60

(D. Conn. Mar. 21, 2006) (quoting Schreiber v. Woldco, LLC, 324 F. Supp. 2d 512, 518-19

(S.D.N.Y. 2002)).  Henderson claims that Shepard's  derogatory remark about Blaney leaving to

"fix her lipstick" when Blaney excused herself from the staff meeting (dkt. # 44, Henderson

Dep., Ex. 8 at 56:6-7)  and his comment about Blaney wearing a skirt and high heels on the

factory floor (dkt. # 44, Henderson Dep., Ex. 8 at 40:14-18.) are not stray remarks.

Although it is unclear when the remarks in question were made, the court finds that taken in the

light most favorable to the nonmoving party, the remarks were made by a decision-maker,

Shepard, and could be viewed as discriminatory.  These remarks, however, are unconnected to

both the decision-making process to terminate Henderson and the adverse employment action

that was taken against Henderson.  Shepard made the remarks with respect to Blaney, not

Henderson.  Further, the remarks did not relate to Henderson's job performance.  In addition, the

parties agree that Shepard did not partake in either the telephone call where Henderson informed

Blaney, LaCroix, and Canova that she no longer wanted to work for the business or the telephone

call where Blaney and LaCroix told Henderson that she could not rescind her resignation.

Lastly, Henderson admits that Shepard alone approved of Blaney and LaCroix's decision not to

allow Henderson to rescind her termination.  Accordingly, Shepard's remarks concerning Blaney

qualify as stray remarks, which cannot be used to prove gender discrimination.

In support of her contention that she was terminated because of her sex, Henderson argues that GE IMV was referred to as "the company run by women" and that Shepard replaced four high ranking female executives (Madrisotti, Kasdan, Gawin, and Henderson) with men during the time period of January 2002 to December 2002.  With respect to her claim that Shepard terminated Madrisotti, Henderson admits that Madrisotti left the company on her own volition, thus making any claim of an adverse employment action due to gender discrimination inapplicable to her.[8]  Additionally, Henderson admits that Kasdan and Gawin were removed for performance reasons and that both Kasdan and Gawin were given an opportunity to transfer to another GE business unit.  Further, although Kasdan, Gawin, and Madrisotti were replaced with men, this development is tempered by Henderson's admission that Shepard hired Brigitte LaCroix, during this time period, to replace a male employee as the Quality Leader for all of the GE Digital Energy businesses.  In addition, Henderson herself notes that she met with Shepard before she was hired to replace a male employee as the Director of Quality and Information Technology.

Although Henderson claims that Shepard terminated her because she was a woman, she does not dispute Blaney's and LaCroix's deposition testimony that she would not have been

---

[8] Henderson also offers Blaney's deposition testimony that Gawin and Madrisotti did not feel comfortable around Shepard.  Although Blaney acknowledged that Shepard could be very intimidating, strong, and sarcastic, (see dkt. # 49-7, Blaney Dep., Ex. 5  at 111-112) Blaney also testified that she did not recall whether anyone specifically told her that Shepard was biased against women (Id. at 112:25-113:19).  Blaney further characterized the conflict between Gawin and Shepard as one of clashing personalities, not one of gender bias.  (Dkt. # 44, Blaney Dep., Ex. 10 at 111:11.)  Accordingly, the statements concerning Shepard's "strong" and "intimidating" personality  (Id. at 111:1-2)  are unrelated to whether Henderson is biased against women and to whether Henderson, or any other women at GE IMV, suffered an adverse employment action because of her gender.

terminated had she not resigned during the meeting of December 5, 2002. She further admits that she told Blaney, LaCroix, and Canova that she no longer wanted to work in the business and that it was Blaney and LaCroix who did not allow her to rescind her resignation during the teleconference of December 9, 2002. Henderson does not challenge the veracity of LaCroix's testimony that she did not allow Henderson to rescind her resignation both "because of her performance" and because she had "lost confidence in her [Henderson's] ability to perform in that position," (dkt. # 44, LaCroix Dep., Ex. 9 at 197:16-17), or Blaney's statement that GE "can't afford to have those leaders making decisions who are going to change their minds," (Dkt. # 44, Blaney Dep., Ex. 10 at 146-47:22-3).

Henderson also asserts that she was treated differently from male employees both prior to and after her termination and that this further proves her claim of gender discrimination. For example, she asserts that Shepard did not take disciplinary actions against Tiziano Christian ("Christian") or Mohammed Alwan ("Alwan") even though these male employees gave poor presentations to Shepard. Even assuming that Christian and Alwan performed poorly, Henderson offers no evidence to indicate that they were treated differently because they were male or that following their poor performances they told their superiors that they wished to leave the business. Henderson also claims that Canova permitted Lauro Strozzi, the head of engineering, to rescind his resignation. Other than her own testimony, however, she offers no evidence to support this assertion. Nor does she indicate when this event occurred, what the circumstances were surrounding this event, or whether Shepard, LaCroix, or Blaney were involved in the decision to allow Strozzi to remain with the company.

In addition, Henderson claims that in September 2002, she was excluded from the annual sales meeting, which was hosted by GE Digital Energy's Sales Department. According to Henderson, she was not invited to the meeting, which was hosted Syed Jafry, the head of sales for GE Digital Energy Europe, even though the male members of the staff, Tiziano Christian, Lauro Strozzi, and Joe Flanagan attended the event. Henderson testified that she learned of the meeting "[b]ecause the last day of the sales meeting, they were doing a report-out to Jim Shepard, and Mauro Canova had approached me and told me that I needed to be there because they did not want Jim to know that I had not been at that meeting the entire time." (Dkt. # 49-4, Henderson Dep., Ex. 2 at 51:3-7.). Henderson makes no claim that she was not invited to the meeting at request of Shepard, LaCroix, Blaney, or Canova. Nor does she indicate who sent out the invitations. Indeed, her testimony indicates that Shepard and Canova wanted her to attend the meeting.

According to Henderson, other terminated employees, such as Peter Elemer, Thomas Host, and Gawin, were allowed access to the GE infrastructure and were permitted to seek other employment opportunities within GE. Henderson claims that she was denied the same access, and that such a denial was a result of gender discrimination. According to Henderson's own deposition testimony and affidavit, however, her treatment was different from all of these individuals, which included both men and women in high ranking positions. For instance, she averred, "After Ms. Gawin was told to move on, she was given the opportunity to transition to another GE business unit. During this transition period, she continued to come to the office and had access to the building and to the Company network to seek to find alternative employment." (Dkt. # 49-3, Henderson Aff., Ex. 1 at ¶ 40; Dkt. # 49-4, Henderson Dep., Ex. 2 at 61:19-20.)

Both Henderson and Blaney also testified that Kasdan was afforded an opportunity to look for another job with GE.  (Dkt. # 49-4, Henderson Dep., Ex. 2 at 61:19-20; Dkt. # 49-7, Blaney Dep., Ex. 5 at 108:13-17.)  Given that Henderson was treated differently from both men and women, this proffer only shows that Henderson was treated differently from other employees, it does not show that she was treated differently because she was a woman.

Looking at the totality of the evidence offered by Henderson, she has not presented sufficient evidence to give rise to an inference of discrimination.  Much of Henderson's evidence of gender bias consists of her own deposition testimony that several other individuals within GE, such as Madrisotti, Gawin, Kasdan, Randolph, and Jones, made statements agreeing with her conclusions that GE discriminated against women.  Yet, Henderson did not provide affidavits or deposition testimony from these individuals.  Nor has Henderson provided any evidence to indicate why Blaney and LaCroix, the two women directly involved in the decision to terminate Henderson, would have terminated Henderson because of her gender.  All the evidence presented concerns the supposed biases of Shepard, not Blaney or LaCroix.  In order to find for the plaintiff, a jury would have to believe that Lacroix and Blaney either carried out an unstated policy of Shepard's, or, even more unbelievably, acted on their own to discriminate against a member of their own class.  Henderson has neither given nor proposed any evidence or any theory to indicate why Blaney and LaCroix acted to effectuate Shepard's supposed gender biases. And Henderson has offered no evidence to indicate that Shepard and Blaney would purposely discriminate against their own suspect class.  Furthermore, during her deposition, when Henderson was asked, "When Mr. Canova said Brigitte [LaCroix] hated you, did Mr. Canova indicate that it was because of your race or your gender?" she responded, "No." (Dkt. # 49-4,

26

Henderson Dep., Ex. 2 at 147:4-7.)  Accordingly, plaintiff has failed to provide any concrete particulars that could prove gender discrimination on the part of GE.  Therefore, defendants are entitled to summary judgment on plaintiff's gender discrimination claim.

### III. CONCLUSION

For the foregoing reasons defendants' motion for summary judgment **(dkt. # 44)** is **GRANTED**.


**SO ORDERED** at Hartford, Connecticut, this __8th___ day of December, 2006.



                                        **/s/DJS**
                              _____
                                **DOMINIC J. SQUATRITO**
                              **UNITED STATES DISTRICT JUDGE**

27